**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARK SWEITZER, derivatively on behalf of FASTLY, INC., | C.A. No.: _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| TODD NIGHTINGALE, RONALD KISLING, AIDA ÁLVAREZ, ARTUR BERGMAN, RICHARD DANIELS, DAVID HORNIK, PAULA LOOP, CHARLES MEYERS, CHRISTOPHER PAISLEY, and VANESSA SMITH, | |
| Defendants, | |
| and | |
| FASTLY, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**</u>

**INTRODUCTION**

Plaintiff Mark Sweitzer ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Fastly, Inc. ("Fastly" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Fastly with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Fastly; (iii) a securities class action against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between February 15, 2024 and May 1, 2024 (the "Relevant Period") with respect to Fastly's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Fastly.

**NATURE OF THE ACTION**

1.      This is a stockholder derivative action asserted on behalf of Nominal Defendant Fastly against certain officers and the members of the Company's Board for the claims asserted herein to recover damages caused to the Company.

2.      Fastly provides an Infrastructure-as-a-Service ("IaaS") cloud platform that purports to enable developers to build, secure, and deliver digital experiences. The Company's edge cloud platform helps top brands deliver fast, safe, and engaging online experiences through edge computing, delivery, security, and observability offerings that improve site performance, enhance security, and empower innovation at a global scale.

3.      The Company boasts that it provides its customers with a "modern architecture" that delivers: (i) built-in security that provides developers and security operations teams with a fast, safe environment to create, build, and run modern applications; (ii) configurability and control that optimize caching and customize rules, allowing customers to instantly activate or deactivate

caching and rules; and (iii) real-time log streaming that purports to offer instant visibility into traffic, performance, threats, and troubleshooting.

4.     The Company purports to achieve its configurability and control features through its Content Delivery Network ("CDN"), a geographically distributed network of proxy servers and data centers.

5.     Content owners such as media companies and e-commerce vendors pay CDN operators to deliver their content to their end users.  Certain companies have adopted a "Multi-CDN" framework, which combines multiple CDNs from various providers into one large global network.  In 2023, a "consolidation trend" emerged in the CDN industry, in which several prominent Multi-CDN companies reduced the number of CDN vendors they had previously managed in an effort to simplify their operations and increase efficiency, opting instead to manage fewer CDN vendors.  Facing reduced competition, Fastly was able to materially increase its market share and drive favorable sequential growth.

6.     On February 14, 2024, the Company issued a press release announcing revenue guidance for 2024 of between $580 million and $590 million (the "February 2024 Press Release").  In the February 2024 Press Release, the Company touted its "demonstrated progress . . . in operational and financial rigor [that] result[ed] in strong gross margins and non-GAAP net income[.]"  The same press release also stated that Fastly's "go-to-market, packaging[,] and channel efforts through 2023 delivered an inflection in [its] customer acquisition" for the year 2023.  Finally, the February 2024 Press Release touted that the Company was well-positioned for 2024 to "driv[e] [its] mission to make every user experience fast, safe, and engaging."

7.     Throughout the Relevant Period, the Individual Defendants (defined below) made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that:  (i) contrary to its representations to investors, Fastly's growth rate – which had been temporarily accelerated by the 2023 CDN consolidation trend – was slowing down among the Company's largest customers; (ii) as a result, Fastly was unlikely to be

able to maintain its 2023 increased market share; (iii) the deaccelerated growth rate was likely to impact the Company's revenue growth in a materially negative way; (iv) accordingly, the Company was unlikely to meet its previously issued revenue guidance for its full-year 2024; (v) Fastly had inadequate internal controls, and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

8.      On May 1, 2024, Fastly issued a press release, slashing its full-year 2024 revenue guidance from between $580 million and $590 million to between $555 million and $565 million – a $25 million decrease (the "May 2024 Press Release").  The new guidance was well below consensus estimates of $584.62 million.

9.      On May 2, 2024, Bank of America ("BofA") downgraded the Company's stock from a "Buy" rating to an "Underperform" rating and slashed Fastly's stock price target by more than half, from $18 to $8.  BofA noted that the "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and that "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

10.      On this news, the Company's stock price dropped $4.14 per share, or 32.02%, from a closing price of $12.93 per share on May 1, 2024, to close at $8.79 per share on May 2, 2024.

11.      As a direct and proximate result of the misconduct described herein by Individual Defendants, Fastly has sustained significant damages as explained below.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a ) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)), and Rule 14a-9 (17 C.F.R. §240-.14a-9) promulgated thereunder, as well as Sections 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D (15 U.S.C. § 78u-4(f)). The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C.

§ 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts and violation of fiduciary duties owed to Fastly.  Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Fastly could have sued the same defendants in this District.

## PARTIES

15.     Plaintiff is a Fastly stockholder and has continuously held Fastly stock from the time of the wrongdoing alleged herein until the present.  Plaintiff will fairly and adequately represent Fastly's interest in this action.

16.     Nominal Defendant Fastly is incorporated under the laws of Delaware, and its principal executive offices are located at 475 Brannan Street, Suite 300, San Francisco, California 94107.  Fastly's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "FSLY."

17.     Todd Nightingale ("Nightingale") has served as the Company's Chief Executive Officer ("CEO") and a member of the Board since September 2022.  For the Company's fiscal year 2023, Nightingale received a base salary of $600,000, almost $9 million in stock awards, and $586,200 in non-equity incentive plan compensation, for a total of almost $10.2 million.  During the Relevant Period, Nightingale sold 99,348 shares of Company stock for proceeds of almost $1.5 million, as shown by the chart below.

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/16/2024 | 50,708 | $16.09 | $815,891.72 |
| 2/26/2024 | 48,640 | $13.93 | $677,555.20 |
| **Total** | **99,348** | | **$1,493,446.92** |

18.     Defendant Ronald Kisling ("Kisling") has served as the Company's Chief Financial Officer ("CFO") since August 2021.  For the Company's full year 2023, Kisling received a base salary of $600,000, and over $4 million in stock awards, for a total of over $4.6 million.  During the Relevant Period, Kisling sold 47,852 shares of Company stock for proceeds of $674,400.78, as shown by the chart below.

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/16/2024 | 12,235 | $16.09 | $196,861.15 |
| 2/26/2024 | 14,939 | $13.93 | $208,100.27 |
| 2/29/2024 | 1,192 | $14.33 | $17,081.36 |
| 4/1/2024 | 12,000 | $12.92 | $155,040.00 |
| 4/16/2024 | 7,486 | $13.00 | $97,318.00 |
| **Total** | **47,852** | | **$674,400.78** |

19.     Defendant Artur Bergman ("Bergman") has served as a member of the Board since March 2011 and as the Company's Chief Technology Officer ("CTO") since April 2024. Previously, Bergman served as Fastly's Chief Architect from February 2020 to April 2024, as CEO from March 2011 to February 2020, and as Chair of the Board from February 2020 to April 2023. For the Company's fiscal year 2023, Bergman received a base salary of $500,000, almost $5.3 million in stock awards, and over $6.6 million in options, for a total of almost $12.4 million. During the Relevant Period, Bergman sold 21,560 shares of Company stock for proceeds of $330,605.86, as shown by the chart below.

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/16/2024 | 9,646 | $16.09 | $155,204.14 |
| 2/20/2024 | 8,387 | $15.03 | $126,056.61 |
| 2/21/2024 | 200 | $15.00 | $3,000.00 |
| 2/26/2024 | 3,327 | $13.93 | $46,345.11 |
| **Total** | **21,560** | | **$330,605.86** |

20.     Defendant Aida Álvarez ("Álvarez") has served as a member of the Board since August 2019.  For the Company's fiscal year 2023, Álvarez received $45,000 in earned fees or paid in cash and stock awards of $199,994, for a total of $244,994.

21.     Defendant Richard Daniels ("Daniels") has served as a member of the Board since November 2021 and as a member of the Audit Committee since November 2021.  For the Company's fiscal year 2023, Daniels received $40,000 in earned fees or paid in cash and stock awards of $199,994, for a total of $239,994.  On March 15, 2024, Daniels sold 7,766 of Company stock for proceeds of $98,317.56, as shown by the chart below.

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/15/2024 | 7,766 | $12.66 | $98,317.56 |

22.     Defendant David Hornik ("Hornik") has served as a member of the Board since February 2013 and as Chair of the Board since April 2023.  Previously, he served as Lead Independent Director of the Board from February 2020 to April 2023.  For the Company's fiscal year 2023, Hornik received $63,352 in earned fees or paid in cash and stock awards of $199,994, for a total of $263,346.

23.     Defendant Paula Loop ("Loop") has served as a member of the Board since July 2021 and as a member of the Audit Committee since July 2021.  For the Company's fiscal year 2023, Loop received $43,750 in earned fees or paid in cash and stock awards of $199,994, for a total of $243,744.

24.     Defendant Charles Meyers ("Meyers") has served as a member of the Board since July 2021.  For the Company's fiscal year 2023, Meyers received $42,898 in earned fees or paid in cash and stock awards of $199,994, for a total of $242,892.

25.     Defendant Christopher Paisley ("Paisley") has served as a member of the Board since July 2018 and as Chair of the Audit Committee since at least 2020.  For the Company's fiscal year 2023, Paisley received $53,750 in earned fees or paid in cash and stock awards of $199,994,

for a total of $253,744.  On February 20, 2024, Paisley sold 1,000 shares of Company stock for proceeds of $15,600 as shown by the chart below.

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/20/2024 | **1,000** | $15.60 | **$15,600.00** |

26.     Defendant Vanessa Smith ("Smith") has served as a member of the Board since November 2021.  For the Company's fiscal year 2023, Smith received $33,750 in earned fees or paid in cash and stock awards of $199,994, for a total of $233,744.

27.     The following Defendants are hereinafter referred to as the "Individual Defendants":  Nightingale, Kisling, Bergman, Álvarez, Daniels, Hornik, Loop, Meyers, Paisley, and Smith.

28.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Nightingale, Bergman, Álvarez, Daniels, Hornik, Loop, Meyers, Paisley, and Smith.

29.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants":  Nightingale, Kisling, Bergman, Daniels, and Paisley.

30.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants":  Daniels, Loop, and Paisley.

31.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

32.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Fastly.

33.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company

and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

34.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

35.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

36.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

37.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Fastly were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements

about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

38.     The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

39.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fastly.

### SPECIFIC CORPORATE GOVERNANCE<br>RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

40.     The Fastly Board has adopted Fastly's Code of Business Conduct and Ethics (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on all employees, including the Individual Defendants, stating, in relevant part:

**The Original Fastly Code of Conduct**

*The Fastly Code of Conduct is ten short statements that set out the expectations for how Fastly personnel work and represent Fastly. And while this [Code of Conduct] is a fresh look for our conduct and ethical expectations, we think these ten statements are worthy of living on as one of our Company policies:*

1.     We comply with all applicable laws and regulations

\*   \*   \*

5.      We operate honestly, ethically, and transparently

\*   \*   \*

9.      We enforce our policies with appropriate discipline after thorough and discreet investigation

\*   \*   \*

**Corporate Disclosure Policy - Principles**

1.      The initial disclosure of material information by Fastly will generally be made only through press releases, SEC filings, or other means reasonably designed to provide broad, non-exclusionary distribution of the information to the public so that all members of the investing public will have an equal opportunity to simultaneously access the material information.

2.      Rumors concerning the business and affairs of Fastly may circulate from time to time, and our general policy is not to comment on such rumors.

3.      We will not confirm or update material information about us that has been previously disclosed to the public, except in a manner consistent with the procedures outlined in this policy.

\*   \*   \*

**Insider Trading**

The bottom line on insider trading is that if you are aware of material nonpublic information about Fastly or another publicly traded company that Fastly has business relationships with and you trade in Fastly's or such other company's securities, you have broken the law.  It does not matter whether the decision to buy or sell was influenced by the material nonpublic information, how many shares you buy or sell, or whether it has an effect on the stock price.

Regardless of who you are, if you know something material about the value of a security that not everyone knows and you trade (or convince someone else to trade) in that security, you may be found guilty of insider trading.  If you are uncertain of whether information might be "material" or "nonpublic" do not hesitate to reach out to The Office of the General Counsel.

**Insider Trading Policy - Principles**

1.      Fastly personnel are responsible for understanding the obligations that come with having access to material nonpublic information and wanting to transact in Fastly securities.

2.      Fastly personnel who are aware of material nonpublic information relating to Fastly may not engage in transactions in Fastly's securities except as permitted by this policy and applicable law.

3.      Fastly personnel who are aware of material nonpublic information relating to Fastly may not recommend the purchase or sale of any Fastly's securities.

4.      Fastly personnel may not disclose material nonpublic information to persons within Fastly whose jobs do not require them to have that information.

5.      Fastly personnel may not disclose material nonpublic information outside of Fastly unless the disclosure is made in accordance with a specific Fastly policy that authorizes such disclosure.

6.      Unless authorized by a Fastly policy and as required by their role at the [C]ompany, Fastly personnel may not assist anyone engaged in transactions in Fastly securities, the recommendation to buy or sell Fastly securities, or the disclosure of material nonpublic information.

### THE DIRECTOR DEFENDANTS ON THE AUDIT COMMITTEE OWE ADDITIONAL DUTIES

41.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Daniels, Loop, and Paisley during the Relevant Period.

42.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

*Auditor Management*

**3. Auditor Independence.**  At least annually, the [Audit] Committee will assess the qualifications, performance, and independence of the Auditors, or in the case of prospective Auditors, before they are engaged.  That assessment will include reviewing written disclosures from any Auditors regarding any relationships they have that may affect independence, as defined by applicable rules and regulations. The [Audit] Committee will review a written statement from any Auditors affirming their independence, and assess, consider, and discuss with them any potential relationships concerning their objectivity and independence.

\*      \*      \*

**6. Internal Control Report.**  At least annually, the [Audit] Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review of the firm's internal quality-control procedures or review, or (iii) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors.

*Annual Audits and Quarterly Reviews:*

**7. Quarterly Reviews and Annual Audit Results.**  The [Audit] Committee will review with management and the Auditors the results of the quarterly financial

reviews and annual audit as well as other significant issues regarding accounting principles and financial-statement presentation, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's critical accounting policies and significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles (**"GAAP"**) methods on the financial statements), and any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies;

- all known and likely misstatements identified during the reviews and audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements;

- any accounting adjustments that were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise);

- the potential impact of the Company's financial statements of alternative treatments and any off-balance sheet structures;

- the scope, design, adequacy[,] and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, and reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies; and

- any other matters that the Auditors must communicate to the [Audit] Committee under applicable accounting or auditing standards.

The [Audit] Committee will review the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The [Audit] Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10- K.

**8. Earnings Announcements.** The [Audit] Committee will review and discuss with management and the Auditors any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. The Chairperson of the [Audit] Committee may represent the entire [Audit] Committee for the purposes of this discussion.

**9. Proxy Report.** The [Audit] Committee will oversee the preparation of the report of the [Audit] Committee required by applicable rules and regulations to be included in the Company's annual proxy statement.

## **RELEVANT BACKGROUND**

43.     Fastly offers an edge cloud platform that the Company claims to deliver "fast, safe and engaging digital experiences" by "focusing holistically on the edge cloud from developer inspiration to end-user experience".  Fastly's edge cloud platform, a type of IaaS, assists developers in building, securing, and delivering digital experiences, facilitating faster e-commerce transactions, business software downloads, and video streaming to mobile devices.

44.     According to the Company, the edge cloud platform represents the convergence of the CDN with functionality that has been traditionally delivered by hardware-centric appliances such as Application Delivery Controllers, Web Application Firewalls, Bot Detection, Distributed Denial of Service, and observability solutions.

45.     Fastly serves enterprises, mid-market companies, and technology-savvy organizations across numerous industries.

46.     In 2023, the CDN market underwent significant consolidation as several developers and media companies combined their CDN needs into a single large global network, known as the Multi-CDN framework.  This consolidation resulted in fewer CDN vendors in the market, creating an opportunity for remaining providers like Fastly to increase their revenue growth and market share.  The Multi-CDN framework was initially seen as a positive development for established players in the industry, as it theoretically allowed them to capture larger portions of the market.

47.     Indeed, Fastly's revenue for the year ended December 31, 2023 was $506 million, an increase from the year ended December 31, 2022 revenue of $432.7 million.

### **THE INDIVIDUAL DEFENDANTS BREACH THEIR DUTIES TO THE COMPANY AND ITS STOCKHOLDERS**

48.     On February 14, 2024, after market hours, the Company issued the February 2024 Press Release announcing its fourth quarter and full year 2023 financial results.  The February 2024 Press Release provided full-year revenue guidance for 2024 of between $580 million and $590 million.  In relevant part, the February 2024 Press Release quoted defendant Nightingale as stating:

This quarter demonstrated the progress we've made in operational and financial rigor resulting in strong gross margins and non-GAAP net income[.]

Our go-to-market, packaging[,] and channel efforts through 2023 delivered an inflection in our customer acquisition as we closed out the year position[ing] us well for 2024, driving our mission to make every user experience fast, safe, and engaging.

49.     During the scripted portion of the related earnings call the same day (the "February 2024 Earnings Call"), Nightingale stated, in relevant part:

I'm pleased to report that we closed out 2023 with revenue of $506 million, representing 17% year-over-year growth and coming in above the original $495 million to $505 million range we guided to one year ago.  We reported record fourth-quarter revenue of $137.8 million, which grew 15% year[-]over[-]year and 8% quarter[-]over[-]quarter.  This result came in at the lower end of our fourth quarter guidance range, driven by weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity.

*     *     *

Our customer retention efforts were stable in the fourth quarter with our [last twelve months] [net revenue retention] at 113%, down slightly from Q3's 114%. Our total customer count in the fourth quarter was 3,243, which increased by 141 customers, compared to Q3 and increased by 181 customers year[-]over[-]year. Enterprise customers totaled 578 in the quarter, an increase of 31 from Q3, representing the highest level of sequential growth since we acquired Signal Sciences back in 2020.  Our new packaging channel program and a renewed demand gen [sic] focus are driving a change in the velocity of customer acquisition at Fastly, and this is finally starting to show up in these disclosed customer accounts.

As these customers grow with Fastly, they will fuel our revenue growth for years to come.  This customer growth is also diversifying our revenue among verticals, which helps us optimize traffic across our fleet, yielding higher profitability.  Our sales team has been energized by our recent success with large customer wins. Of the 31 new enterprise customers this quarter, 19 were net new to Fastly.

50.     During the same call, defendant Kisling stated as follows:

For calendar year 2024, we expect revenue in the range of $580 million to $590 million, an annual growth rate of 16% at the midpoint.

*     *     *

This guidance reflects our expectation for quarter[-]on[-]quarter acceleration and revenue growth through the year driven by new customer acquisition and continued expansion of existing customers.  We expect to continue to see gross margin improvement in 2024 and to continue our spending discipline while increasing our investment in go-to-market and product development.  We anticipate our 2024 gross margins will improve by approximately 200 basis

points, plus or minus 100 basis points relative to 2023, and to exit the year with gross margins at 60% or better.

51.    On February 22, 2024, the Company filed its full year 2023 report on Form 10-K with the SEC (the "2023 Form 10-K"), which was signed by the Individual Defendants.  The 2023 Form 10-K provided an overview of Fastly's performance for its 2023 fiscal year.  In relevant part, the 2023 Form 10-K stated:

> Developers on the Fastly platform have a high degree of flexibility with granular control and real-time visibility, where they can write and deploy code in a serverless environment and push application logic to the edge.  Our infrastructure is built for the software-defined future.  Our network is powerful, efficient, and flexible, designed to enable us to rapidly scale to meet the needs of the most demanding customers.  Our approach to scalable, secure reliability integrates security into multiple layers of development: architecture, engineering, and operations.  That's why we invest in building security into the fabric of our platform, alongside performance.  We provide developers and security operations teams with a fast and safe environment to create, build, and run modern applications.

> *        *        *

> For the fiscal years ended December 31, 2023, 2022[,] and 2021, our revenue was $506.0 million, $432.7 million, and $354.3 million, respectively.  We continue to invest in our business and had a net loss of $133.1 million, $190.8 million[,] and $222.7 million for the fiscal years ended December 31, 2023, 2022[,] and 2021, respectively.

52.    The 2023 Form 10-K also discussed the Company's growth strategy, stating *inter alia*, that:

> ***Our Growth Strategy***

> Our growth strategy focuses on making our edge cloud platform accessible to a broader base of customers through enhancing our product experience, investments in technology, and vertical expansion.  Key elements of our growth strategy include the following:

> - *Product strategy*.  Built upon a strategy of durable innovation, our programmable edge cloud platform creates a consistent and predictable pipeline of innovation.  We plan to expand existing product lines like Network Services and Security, and expect to further incubate newer product lines like Compute and Observability for future growth.

> - With the goal of making it easier for customers to do business with us, we will continue to build out a single, unified platform where they can access and manage all their Fastly services in one place.  We will simplify customer onboarding and service usage, through easy access to self-training information from within the Fastly app, and more code samples

and support.  In 2023, we simplified our pricing and packaging in order to make it easier for customers to buy and renew our services.

- We launched our Next-Gen WAF in Q1 of 2022.  This enables us to protect customers' applications and APIs on premise, in the cloud and on the edge.  We plan to continue to invest in application security with the goal of making it easier for developers to seamlessly protect their apps and APIs wherever they are without impacting performance.

- *Expansion into additional vertical markets*.  Our platform offers a broad range of capabilities.  Our differentiated high performance and low-latency delivery network and edge compute platform, as well as enhanced security capabilities, allows us to serve the needs of our existing customers and continue to add customers from a diverse set of industries.

- *Expand existing customer relationships*.  Over time, our customers have expanded their use of our platform.  In more technically savvy organizations, developers have championed our solution, paving the way for us to engage with business decision makers.  For more traditional organizations, we are often brought in to initially help facilitate a move to the cloud and from there we extend our product to support many other use cases.  We plan to continually increase wallet-share over time for existing customers as we build out new products and features, and as customers continue to fully recognize the value of our platform.

- *Grow our technology partner ecosystem*.  We operate between and complement the "big 3" origin cloud platforms, Amazon Web Services ("AWS"), Microsoft (Azure), and Google Cloud Platform, and a growing community of companies that provide big data, machine learning, and security solutions.  In this sense, we act as the unifying layer for a growing number of cloud services.  As customers consume more cloud and software as a service ("SaaS") offerings, we can create additional value and grow with these partners.

- *International expansion*.  As our customer base grows, we plan to scale our network to bring edge computing closer to where our customers are.  We believe significant opportunities exist for international growth.

53.     The 2023 Form 10-K was certified by defendants Kisling and Nightingale pursuant to the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX").  Specifically, Kisling and Nightingale certified that the 2023 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

54.     The statements referenced in the February 2024 Press Release, the February 2024 Earnings Call, and the 2023 Form 10-K were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) contrary to its representations to investors, Fastly's growth rate – which had been temporarily accelerated by the 2023 CDN consolidation trend – was slowing down among the Company's largest customers; (ii) as a result, Fastly was unlikely to be able to maintain its 2023 increased market share; (iii) the deaccelerated growth rate was likely to impact the Company's revenue growth in a materially negative way; (iv) accordingly, the Company was unlikely to meet its previously issued revenue guidance for its full-year 2024; (v) Fastly had inadequate internal controls, and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

## THE COMPANY ISSUES FALSE AND MISLEADING PROXY STATEMENTS

55.     On April 24, 2024, Fastly filed a Schedule 14A with the SEC (the "2024 Proxy Statement"). Director Defendants Nightingale, Bergman, Álvarez, Daniels, Hornik, Loop, Meyers, Paisley, and Smith solicited the 2024 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act. The 2024 Proxy Statement contained material misstatements and omissions.

56.     The 2024 Proxy Statement asked Fastly stockholders to vote to, among other things: (1) re-elect defendants Hornik, Meyers, and Smith to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2027; (2) ratify the appointment of Deloitte & Touche LLP as Fastly's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, including defendants Bergman, Kisling, and Nightingale, commonly referred to as "Say-on-Pay."

57.     The 2024 Proxy Statement stated that as a nominee defendant Hornik was qualified based on his "experience with technology companies in our industry, his service on public and

private company boards, and the historical knowledge and continuity" and that Meyers was similarly qualified due to his "experience in the technology industry and his deep knowledge of cybersecurity risks faced by leading telecommunications and information technology companies". Smith was qualified based on her "experience in human capital management".

58.     The 2024 Proxy Statement included the following under the heading "The Role of the Board of Directors in Risk Oversight":

> One of the key functions of our Board of Directors is informed oversight of our risk management process. In particular, our Board of Directors is responsible for monitoring and assessing exposure from strategic risk, operational risk and technology risk, information security risk, and cybersecurity risk with periodic reporting from our most senior information security officer and other members of senior management. Our executive officers are responsible for the day-to-day management of the material risks we face. Our Board of Directors administers its oversight function directly as a whole, as well as through various standing committees of our Board of Directors that address risks inherent in their respective areas of oversight. Our Audit Committee is responsible for overseeing the management of risks associated with our financial reporting, accounting and auditing matters, investment risks and foreign exchange risks, and tax matters. Our Compensation Committee oversees the management of risks associated with talent and our compensation policies and programs; and our Nominating and Corporate Governance Committee oversees the management of risks associated with director independence, conflicts of interest, composition, organization, and evaluation of our Board of Directors, director succession planning, law and compliance, and oversight of corporate governance, including environmental, social and governance ("ESG")-related matters.

59.     The 2024 Proxy Statement went on to specify that Audit Committee's "principal duties" include, among other things:

- helping to ensure the independence and performance of the independent registered public accounting firm;
- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results;
- reviewing with the independent registered public accounting firm any communications with respect to auditing or accounting issues;
- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;
- reviewing our policies on risk assessment and risk management related to financial reporting, accounting and auditing matters, investment risks and foreign exchange risks, and tax matters;

- reviewing related party transactions;

* * *

- reviewing internal audit's scope and annual plan;

- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes its internal quality-control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law;

- approving (or, as permitted, pre-approving) all audit and all permissible non-audit services, other than de minimis non-audit services, to be performed by the independent registered public accounting firm; and

- reviewing and discussing any reports of evidence of material violation of securities laws and breaches of fiduciary duty and other similar violations.

60.    Regarding "Corporate Governance Guidelines", the 2024 Proxy Statement stated that the guidelines "assure that the Board of Directors will have the necessary authority and practices in place to review and evaluate our business operations as needed and to make decisions that are independent of our management"  and that they "are also intended to align the interests of directors and management with those of our stockholders."

61.    The 2024 Proxy Statement also included the following under the heading "Code of Business Conduct and Ethics":

> We have adopted a Code of Business Conduct and Ethics (the "Code of Conduct") applicable to all of our employees, executive officers, and directors.   The Code of Conduct is available on our website at investors.fastly.com.   The Nominating and Corporate Governance Committee of our Board of Directors is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for executive officers and directors.   If we make any substantive amendments to the Code of Conduct or grant any waiver from a provision of the Code of Conduct to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.

62.    The 2024 Proxy Statement was materially misleading because it failed to disclose that:  (i) although Fastly claimed its officers and directors adhered to the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants violated the Code of Conduct and Corporate Governance Guidelines; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise

these functions and were causing or permitting Fastly to issue false and misleading statements; (iii) the Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information (discussed below); and (iv) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

63.     The 2024 Proxy Statement was further materially misleading because it failed to disclose to investors, *inter alia*, that:  (i) contrary to its representations to investors, Fastly's growth rate – which had been temporarily accelerated by the 2023 CDN consolidation trend – was slowing down among the Company's largest customers; (ii) as a result, Fastly was unlikely to be able to maintain its 2023 increased market share; (iii) the deaccelerated growth rate was likely to impact the Company's revenue growth in a materially negative way; (iv) accordingly, the Company was unlikely to meet its previously issued revenue guidance for its full-year 2024; (v) Fastly had inadequate internal controls, and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

## THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

64.     During the Relevant Period, Fastly insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

65.     The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- Between February 16, 2024 and February 26, 2024, defendant Bergman sold 21,560 shares of Company stock for proceeds of $330,605.86.

- On March 15, 2024, defendant Daniels sold 7,766 shares of Company stock for proceeds of $98,317.56.

- • Between February 16, 2024 and April 16, 2024, defendant Kisling sold 47,852 shares of Company stock for proceeds of $674,400.78.

- • Between February 16, 2024 and February 26, 2024, defendant Nightingale sold 99,348 shares of Company stock for proceeds of $1,493,446.92.

- • On February 20, 2024, defendant Paisley sold 1,000 shares of Company stock for proceeds of $15,600.

66.     While many of the Company's stockholders lost significant money with Fastly's share price dropping substantially when the truth was revealed, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders.

67.     As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Fastly stock and stock options they held.

## THE TRUTH IS REVEALED

68.     On May 1, 2024, after market hours, the Company issued the May 2024 Press Release announcing its first quarter 2024 financial results.  The May 2024 Press Release revealed, among other things, that Fastly had revised and lowered its full year 2024 revenue guidance by $25 million – down to between $555 million and $565 million from the previously announced guidance of between $580 million and $590 million, and below consensus estimates of $584.62 million for full year 2024.

69.     The May 2024 Press Release quoted defendant Nightingale as stating, in relevant part:

> I am pleased with the first quarter operating performance, posting non-GAAP operating loss above our guidance and positive cash flow from operations . . . [b]ut, we're not satisfied with our revenue growth outlook.

70.     During the related earnings call, defendant Nightingale explained the "factors that contributed to a challenging short-term environment," which resulted in Fastly's revised guidance for its fiscal year 2024.  In relevant part, Nightingale stated:

Now let me turn to address our outlook going forward.  Our second-quarter guidance of 6% to 9% year-over-year growth and modified 2024 annual rent of 12% year-over-year growth are not where we expected our business to perform, and of course, are disappointing.

*       *       *

There are a few factors that contributed to a challenging short-term environment. The biggest factor is a reduction of revenue from a small number of our largest customers.  The first-quarter revenue from our top 10 customers dropped from 40% to 38%.

Many of the top 10 accounts run a multi-vendor strategy.  And we did see significant volatility here.  And there are a few reasons for that.  Firstly, historically, Fastly has gradually won greater traffic share in our largest accounts. But with the timing of rate and volume changes, we saw increased volatility this quarter.  To be clear, we have not been removed from any of our largest customers and we remain in a strong strategic position, each of them long term.

Secondly, in some accounts, we did see an addition of CDN vendors or reversal of the vendor consolidation we saw last year.  And thirdly, we are seeing a slight uptick from the typical level of rerates with our largest customers, but we have not yet seen the commensurate traffic expansion usually associated with this motion.

71.     During the same call, defendant Kisling acknowledged that Fastly "[was] facing a challenging environment of revenue declines in our largest customers, overshadowing the impact of new customer acquisition and product pipeline."  Kisling continued, stating:

Our guidance reflects these dynamics in our business and the visibility that we have today.  We expect a flattish to modest sequential decline in Q2 revenues compared to our Q1 results due to lower traffic, specifically at our largest customers.  We also will not benefit in 2024 from the favorable impact of the CDN consolidation that occurred in early 2023 that drove favorable sequential growth in the prior year same period

72.     On May 2, 2024, BofA downgraded the Company's stock from a "Buy" recommendation to an "Underperform" rating, slashing Fastly's stock price target by over half, from $18 per share to $8 per share.  BofA noted that the "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and that "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

23

73.     On this news, the price of the Company's stock dropped $4.14 per share, or 32.02%, from a closing price of $12.93 per share on May 1, 2024, to close at $8.79 per share on May 2, 2024.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

74.     On May 24, 2024, a purported purchaser of Fastly securities filed a securities class action complaint, captioned *Kula v. Fastly, Inc., et al.*, Case No. 3:24-cv-03170 in the United States District Court for the Northern District of California against Fastly, Kisling, and Nightingale (the "Securities Class Action").   The Securities Class Action alleges that throughout the class period of February 15, 2024 (the day after Fastly issued the February 2024 Press Release after market hours) and May 1, 2024, Fastly, Nightingale, and Kisling made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT
## DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO FASTLY

75.     As a result of the Individual Defendants' improprieties, Fastly disseminated improper public statements concerning its operations, prospects, and internal controls.   This misconduct has devastated Fastly's credibility.

76.     As a direct and proximate result of the Individual Defendants' actions, Fastly has expended and will continue to expend significant sums of money defending and paying any settlement in the Securities Class Action.

77.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Fastly's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

78.     In addition, the actions of the Individual Defendants have irreparably damaged Fastly's corporate image and goodwill.  For at least the foreseeable future, Fastly will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been

implicated in illegal behavior and have misled the investing public, such that Fastly's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to:  (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the actions described herein occurred under the authority and approval of the Board.

82.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Fastly and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

85.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

86.     Plaintiff is an owner of Fastly common stock and has been an owner of Fastly common stock since the wrongdoing alleged herein.

87.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE**

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

89.     At the time Plaintiff commenced this action, the Board consisted of the nine Director Defendants:  Nightingale, Bergman, Álvarez, Daniels, Hornik, Loop, Meyers, Paisley, and Smith.  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

90.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Fastly Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**Demand Is Futile Because Each Member of the**
**Board Faces a Substantial Likelihood of Personal Liability**

91.     The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Fastly's business, operations, prospects, internal controls, and financial statements.

92.     Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

93.     The Director Defendants face a substantial likelihood of personal liability because of their knowing and/or reckless authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions and failures constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

94.     The Director Defendants also solicited the 2024 Proxy Statement asking its stockholders to vote, among other things, to reelect defendants Hornik, Meyers, and Smith to the Board in continued breach of their fiduciary duties.

95.     The Director Defendants further approved the 2024 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

96.     If the Director Defendants were to bring a suit on behalf of Fastly to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiff making a demand would be futile.

### The Audit Committee Defendants Face a Greater Likelihood of Personal Liability

97.     The Audit Committee Defendants (Daniels, Loop, and Paisley), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial information.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, the Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

### The Insider Trading Defendants On the Board
### Face a Greater Likelihood of Personal Liability

98.     Because of their positions as officers and/or Board members, each of the Insider Trading Defendants (Nightingale, Kisling, Bergman, Daniels, and Paisley) possessed material non-public information that:  (i) contrary to its representations to investors, Fastly's growth rate – which had been temporarily accelerated by the 2023 CDN consolidation trend – was slowing down among the Company's largest customers; (ii) as a result, Fastly was unlikely to be able to maintain its 2023 increased market share; (iii) the deaccelerated growth rate was likely to impact the Company's revenue growth in a materially negative way; (iv) accordingly, the Company was unlikely to meet its previously issued revenue guidance for its full-year 2024; (v) Fastly had inadequate internal controls, and (vi) as a result, the Individual Defendants' positive statements

about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

99.      The Insider Trading Defendants unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices.  As a result, the Insider Trading Defendants' conduct harmed Fastly as the Insider Trading Defendants unjustly enriched themselves at the Company's expense.  Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants, and because the Insider Trading Defendants face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, the Insider Trading Defendants are incapable of considering a demand to commence and vigorously prosecute this action.

### Additional Demand Futility Allegations

100.     Defendant Nightingale is not an independent director.   Nightingale is not independent because he has served on the Board and as Fastly's CEO since 2022.  As such, the 2024 Proxy Statement explicitly states that Nightingale is not independent.  Defendant Nightingale received  substantial  compensation  during  the  Relevant  Period  and  continues  to  receive compensation.  For the Company's fiscal year 2023, Nightingale received a base salary of $600,000, almost $9 million in stock awards, and $586,200 in non-equity incentive plan compensation for a total of almost $10.2 million.  This amount is material to Nightingale, and therefore, he would not be able to impartially consider a demand against the Director Defendants who  are  members  of  Fastly's  Compensation  Committee,  and  thus  approve  his  executive compensation.  Accordingly, for these reasons and those described above and below, demand is futile as to defendant Nightingale.

101.     Nightingale is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5 promulgated under the Exchange Act.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Nightingale's willful and/or reckless

violations of his obligations as an officer and director of Fastly.  Hence, Nightingale is incapable of considering a demand to commence and vigorously prosecute this action because he faces an even greater likelihood of personal liability than the rest of the Director Defendants.

102.     Defendant Bergman is not an independent director.  Bergman is not independent because he has served as a member of the Board since March 2011 and as the Company's CTO since April 2024.  Previously, he served as Fastly's Chief Architect from February 2020 to April 2024, as its CEO from March 2011 to February 2020, and as Chair of the Board from February 2020 to April 2023.  As such, the 2024 Proxy Statement explicitly states that Bergman is not independent.  Defendant Bergman received substantial compensation during the Relevant Period and continues to receive compensation.  For the Company's fiscal year 2023, Bergman received a base salary of $500,000, almost $5.3 million in stock awards, and over $6.6 million in options for a total of almost $12.4 million.  This amount is material to Bergman, and therefore, he would not be able to impartially consider a demand against the Director Defendants who are members of Fastly's Compensation Committee, and thus approve his executive compensation.   Accordingly, for these reasons and those described above, demand is futile as to defendant Bergman.

103.     Defendant Hornik has served as a member on the board of directors of Bill.com since May 2016.  Defendant Álvarez also serves as a member of Bill.com's board of directors and has done so since May 2022.  This interpersonal or business connection renders defendants Hornik and Álvarez incapable of independently or fairly considering the claims alleged herein.

104.     Defendant Meyers has a longstanding relationship with defendant Paisley as Meyers serves as the CEO and a director of Equinix, Inc. ("Equinix") and has served in various other executive positions at Equinix since 2010.  Defendant Paisley has served as a director of Equinix since 2007.  This interpersonal or business connection renders defendants Meyers and Paisley incapable of independently or fairly considering the claims alleged herein.

**FIRST CAUSE OF ACTION**
**Against the Individual Defendants for Breach of Fiduciary Duties**

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

106.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Fastly's business and affairs.

107.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

108.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Fastly.

109.    In breach of their fiduciary duties owed and owe to Fastly, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:  (i) contrary to its representations to investors, Fastly's growth rate – which had been temporarily accelerated by the 2023 CDN consolidation trend – was slowing down among the Company's largest customers; (ii) as a result, Fastly was unlikely to be able to maintain its 2023 increased market share; (iii) the deaccelerated growth rate was likely to impact the Company's revenue growth in a materially negative way; (iv) accordingly, the Company was unlikely to meet its previously issued revenue guidance for its full-year 2024; (v) Fastly had inadequate internal controls, and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

110.    Accordingly, Fastly's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

111.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

112.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

113.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

114.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

115.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Fastly has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of Sections 10(b) of the Exchange Act and Rule 10b-5**

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

118.    The Individual Defendants are liable to the Company because they violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

119.    The Individual Defendants did the following while acting individually and collectively:

      (a)    employed devises, schemes, and artifices to defraud;

      (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Fastly common stock during the Relevant Period.

120.    As set forth above, the Individual Defendants disseminated or approved the dissemination of material false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

121.    The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

122.    As a result of the Individual Defendants making these materially false and misleading statements or permitting them to be made, Fastly's common stock traded at artificially inflated prices during the Relevant Period.

123.    Accordingly, the Company has suffered damages because it paid artificially inflated prices for Fastly common stock.

### THIRD CAUSE OF ACTION
**Against Defendants Nightingale and Kisling**
**for Contribution under Sections 10(b) and 21D of the Exchange Act**

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

125.    Fastly along with defendants Nightingale and Kisling are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Fastly.

126.    Because of their positions of control and authority as officers and/or directors of Fastly, defendants Nightingale and Kisling were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Fastly, including the wrongful acts complained of herein and in the Securities Class Action.

127.    Accordingly, defendants Nightingale and Kisling are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

128.    As such, Fastly is entitled to receive all appropriate contribution or indemnification from defendants Nightingale and Kisling.

## FOURTH CAUSE OF ACTION
### Against the Individual Defendants for
### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

129.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

130.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

131.    The 2024 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Fastly stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its retention and addition of subscribers.

132.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and roles in the process and in the preparation of the 2024 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2024 Proxy Statement.

133.    The Individual Defendants knew that the statements contained in the 2024 Proxy Statement were materially false and misleading.

134.    The omissions and false and misleading statements in the 2024 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the reelection of directors.  Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2024 Proxy Statement and in other information reasonably available to stockholders.

135.    As a direct and proximate result of the dissemination of the false and misleading 2024 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and

thereby reelect directors, Nominal Defendant Fastly suffered damage and actual economic losses (*i.e.*, wrongful reelection of directors) in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for Unjust Enrichment**

136.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

137.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fastly.

138.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Fastly that was tied to the performance or artificially inflated valuation of Fastly, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

139.    Plaintiff, as a stockholder and representative of Fastly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits – including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation – obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary and contractual duties.

140.    Plaintiff, on behalf of Fastly, has no adequate remedy at law.

**SIXTH CAUSE OF ACTION**
**Against the Individual Defendants for Waste of Corporate Assets**

141.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the

Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

143.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

144.    Plaintiff, on behalf of Fastly, has no adequate remedy at law.

**SEVENTH CAUSE OF ACTION**
**Against the Individual Defendants for Aiding and Abetting**

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Fastly and has participated in a conspiracy in breach of fiduciary duties.

147.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

148.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

149.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual

Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

150.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

151.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**EIGHTH CAUSE OF ACTION**
**Against the Insider Trading Defendants for**
**<u>Insider Selling and Misappropriation of Information</u>**

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    At the time of their stock sales set forth herein, the Insider Trading Defendants (Nightingale, Kisling, Bergman, Daniels, and Paisley) knew of the information described above and sold Fastly common stock on the basis of such information.

154.    The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Fastly common stock.

155.    The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

156.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Fastly and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Fastly stock while in possession of insider information as described herein;

D.      Awarding prejudgment interest to the Company;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 23, 2024

OF COUNSEL:

Melissa A. Fortunato
(pro hac vice to be submitted)
Marion C. Passmore
(pro hac vice to be submitted)
BRAGAR EAGEL & SQUIRE, P.C.
810 Seventh Avenue, Suite 620
New York, New York 10019
Tel: (212) 308-5858
Fax: (212) 214-0506
fortunato@bespc.com
passmore@bespc.com

Respectfully submitted,

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (DE Bar # 3569)
DELEEUW LAW LLC
1301 Walnut Green Road
Wilmington, DE 19807
Tel: (302) 274-2180
Fax: (302) 351-6905 (fax)
brad@deleeuwlaw.com

*Attorneys for Plaintiff Mark Sweitzer*